IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LTC Partners, LLC, a Delaware limited liability company, and JOEL DRYER, an individual, | |
| Plaintiffs, | |
| v. | No. 19-cv-6190 |
| DUANE WILKEY and AARON WILKEY, individuals, and ADW PARTNERS, LLC, a Utah limited liability company, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs, LTC Partners, LLC ("**LTC**") and Joel Dryer ("**Dryer**"), through their counsel, Taft Stettinius & Hollister LLP, for their Complaint, pursuant to 28 U.S.C. § 2201, against Defendants, Duane Wilkey, Aaron Wilke (collectively with Duane, the "**Wilkeys**") and ADW Partners, LLC ("**ADW**"), allege:

## NATURE OF THE CASE

1. This is an action for declaratory judgment in connection with a limited liability company agreement dated May 15, 2017, as amended (the "**Operating Agreement**"), establishing the contractual rights of the Members and Manager of Monet Medical Inc., LLC ("**Monet**" or the "**Company**"), a Delaware limited liability company. This action seeks to declare under the Declaratory Judgment Act, 28 U.S.C. § 2201, that Dryer, as Manager of Monet, does not owe the Wilkeys, ADW or Monet any fiduciary duties other than those specified in the Operating Agreement, and that Dryer initiated a capital call in accordance with the terms of the Operating Agreement and consistent with his rights and obligations as Manager.

2. Further, in this action, Dryer and LTC seek a declaration that Monet does not owe the Wilkeys or ADW any reimbursable business expenses, as Monet, the Wilkeys and ADW agreed the Wilkeys would convert $60,000 of alleged reimbursable business expenses into an unsecured loan made by ADW to Monet, accruing interest at a rate of 8% per annum.

## PARTIES, JURISDICTION AND VENUE

3. Plaintiff LTC Partners, LLC is a citizen of Illinois because its sole member, Joel Dryer, is a citizen of the state of Illinois.

4. Plaintiff Joel Dryer is a citizen of the State of Illinois because he is an individual who maintains his principal residence in Evanston, Illinois.

5. Defendant Duane Wilkey is a citizen of the State of Utah because he is an individual who maintains his principal residence in West Valley City, Utah.

6. Defendant Aaron Wilkey is a citizen of the State of Utah because he is an individual who maintains his principal residence in West Jordan, Utah.

7. Defendant ADW Partners, LLC, is a citizen of Utah because its sole members, Duane Wilkey and Aaron Wilkey, are citizens of the state of Utah.

8. The Court has personal jurisdiction over the Wilkeys and ADW because they each consented by execution of the Operating Agreement that any suit, action or proceeding with respect to the Operating Agreement would take place in Illinois.

9. Subject matter jurisdiction in this Court is founded upon diversity of citizenship. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. In addition, there is complete diversity among the parties because Plaintiffs are citizens of Illinois, and Defendants are citizens of Utah. 28 U.S.C. § 1332(a).

10. Venue is proper in this District pursuant to 28 U.S.C §1391(b) because Plaintiff Dryer is a resident of this District, and some or all of the wrongful acts complained of herein

arise out of, and are related to, acts conducted within this District. Further, the Wilkeys and ADW each consented to venue in this Court by execution of the Operating Agreement.

## ALLEGATIONS

**I.     Monet Reconditions, Repairs and Services Medical Equipment.**

11.    Monet sells reconditioned medical equipment under warranties that, in many cases, meet or exceed the original manufacturer's warranties.

12.    Since the creation of Monet, Dryer and the Wilkeys have been responsible for running the day-to-day operations of Monet, including the management of all sales and marketing, accounting, administration, financing and risk management.

13.    Prior to their unexpected resignations on June 28, 2019, the Wilkeys were key employees of Monet. Duane Wilkey held the position of Biomedical Engineering Manager, and Aaron Wilkey held the positions of Biomedical Engineer and Accountant.

14.    Dryer is the Manager and Chief Executive Officer of Monet.

**II.    The Manager Has the Right to Raise Capital Upon Determining it is in the Company's Best Interest to Raise Additional Funds.**

15.    On or about May 15, 2017, the Wilkeys and Dryer entered into an Operating Agreement regulating the affairs of Monet, the conduct of its business and the relations among the Members, Manager and Monet. A copy of the Operating Agreement is attached hereto as **Exhibit 1**.

16.    On or about May 15, 2017, Monet purchased substantially all of the assets of Monet Medical, Inc., a Utah corporation (the "**Predecessor Company**"). At the time, the Predecessor Company, managed almost exclusively by Andrew Caprio and Duane Wilkey, was in poor financial condition.

17. Monet purchased substantially all the assets of the Predecessor Company for nominal consideration and an assumption of specified liabilities of the Predecessor Company, including $840,000 in debts owed to various parties, which Dryer arranged to be paid in full at closing, and approximately $1.2 million of bank debt, which Dryer agreed to personally guarantee. The Wilkeys had previously loaned $600,000 to the Predecessor Company, which loan obligation was not assumed by Monet.

18. The Wilkeys each contributed $15 to the capital of Monet, which $30 comprised 30% of the original $100 of capital contributions funded to Monet and for which they were each allocated a 15% membership interest in Monet.

19. On or about December 31, 2017, the Operating Agreement was amended. A copy of the First Amendment to the Operating Agreement is attached hereto as **Exhibit 2**.

20. On or about September 26, 2018, the Operating Agreement was amended a second time. A copy of the Second Amendment to the Operating Agreement is attached hereto as **Exhibit 3**.

21. On or about September 13, 2018, Dryer transferred his 70% Membership Interest to LTC. See **Exhibit 4,** Joel Dryer's Request for Consent to Substitution of Member and/or Assignment of Membership Interest

22. On or about October 23, 2018, the Wilkeys each transferred their 15% Membership Interest to ADW. See **Exhibit 5,** Aaron Wilkey's Request for Consent to Substitution of Member and/or Assignment of Membership Interest; see **Exhibit 6,** Duane Wilkey's Request for Consent to Substitution of Member and/or Assignment of Membership Interest.

23. As of October 23, 2018, ADW held 30% of all outstanding Membership Interests in Monet, and LTC held 70% of all outstanding Membership Interests in Monet. **Exhibit 3.**

24. Section 9.2 of the Operating Agreement (as amended pursuant to the Second Amendment) provides that if Dryer, as Manager, determines that it is in the Company's best interest to raise additional funds, he shall send a notice to the Members containing: (a) the total amount of additional capital contributions being sought from each Member, which amount shall be based on their percentage Membership Interest (the "Requested Amount"); and (b) any additional material terms thereto. The Operating Agreement provides that: (i) each of the existing Members shall have the opportunity for 15 days following issuance of the notice to contribute the Member's Requested Amount; and (ii) if a Member fails to contribute the entire Requested Amount, the Manager shall permit the Members who did contribute their entire Requested Amount to contribute, on a pro rata basis, the uncontributed portions of the other Members' Requested Amounts. **Exhibit 3, Section 9.2.**

### III. In Accordance With the Delaware Limited Liability Company Act, Dryer Has Limited Obligations to Monet Under the Terms of the Operating Agreement.

25. Section 16.6 of the Operating Agreement provides that the Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Delaware (without regard to its conflicts of law provisions), and specifically the Delaware Limited Liability Company Act (the "**DLLCA**").

26. Under the DLLCA:

> A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

5

6 Del. C. § 18-1101(c).

27. In accordance with the DLLCA, Dryer's obligations as Manager of Monet are specifically defined under and limited to the terms of the Operating Agreement.

28. As Manager of Monet, the Operating Agreement provides that Dryer has the "full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business." **Exhibit 1**, **Section 7.1**.

29. Dryer's duty of care in discharging his duties as Manager is limited in the Operating Agreement to merely "refraining from engaging in fraud or a knowing violation of law which results or shall have resulted in material loss or injury to the Property or operations of the Company." *Id.*, **Section 7.5**. Further, the Wilkeys and ADW (by agreeing to be bound by the terms of the Operating Agreement) agreed to waive "any claim against each Manager [Dryer] for any and all losses, damages, liability claims, causes of action, omissions, demands and expenses or any other act or failure to act arising from or out of Manager's duties as Manager provided the action or failure to act complies with the standard of conduct set forth in the first sentence of Section 7.8." *Id.*, **Section 7.8**. Thus, the Wilkeys and ADW waived all claims against Dryer, and agreed to hold him harmless with respect to any allegations of wrongdoing except fraud or a knowing violation of the law, which results in material loss or injury to Monet or its property.

30. Under the Operating Agreement, Dryer, as Manager, is not required to dedicate his full time and attention to Monet's business, and may have other business interests and engage in activities in addition to those relating to the Company. *Id.*, **Section 7.5**.

31. Further, Dryer, as Manager, has "the right to keep confidential from the Members, for such period of time as the Manager shall deem reasonable, any information which

the Manager reasonably shall believe to be in the nature of trade secrets or other information the disclosure of which the Manager in good faith shall believe is not in the best interest of the Company or could damage the Company or its business or which the Company is required by law or by agreement with a third party to keep confidential." *Id.*, **Section 3.3**.

32. Dryer also has the power to amend the Operating Agreement without the consent of the Members as may be required to, among other things: (1) add to the obligations of the Manager or surrender any right or power granted to the Manager or any affiliate of any Manager for the benefit of the Members; and (2) reflect the issuance of additional Membership Interests or the admission, substitution, termination or withdrawal of Members in accordance with the Operating Agreement. *Id.*, **Section 5.3(b)**.

33. The Wilkeys and ADW (by agreeing to be bound by the terms of the Operating Agreement) expressly acknowledged and agreed that Dryer has "no fiduciary duty of loyalty" and "no fiduciary duty of care" except as to obligations expressly set forth in the Operating Agreement. *Id.*, **Section 7.8**.

**IV.  The Wilkeys Collude to Devalue The Company.**

34. On or about January 25, 2019, the Wilkeys approached Dryer about purchasing LTC's 70% Membership Interest in Monet for a $600,000, ten-year note, with no specified interest rate, and a promise to repay the $1.2 million bank loan, thereby removing Dryer as a personal guarantor. See **Exhibit 7**, January 25, 2019 Letter of Intent. In addition, the Wilkeys hired a financial advisor, unbeknownst to Dryer, sharing critical and confidential Company intellectual property with the advisor.

35. Subsequent to the Letter of Intent, on or about June 18, 2019, the Wilkeys modified their offer whereby they would pay Dryer $1 million over ten years, unsecured by any assets, at an interest rate of 3% per annum, and use their "best efforts" to refinance Monet's $1.2

million bank loan; however, if they did not successfully refinance the loan, Dryer's personal guarantee would remain in full force and effect. Dryer rejected the offer because he believed it was not commercially reasonable, and he believed the Wilkeys lacked the financial wherewithal to cause the bank to remove his personal guarantee of the bank loan.

36. As Dryer later learned, around the same time (June 2019), the Wilkeys approached Monet's bank, without Dryer's knowledge or consent, to advise they were unhappy with the leadership of the Company and were thinking about buying LTC out. Further, they inquired with the bank about refinancing Monet's $1.2 million loan.

37. Weeks after the Wilkeys surreptitiously approached Monet's bank, the bank exerted pressure on Monet to pay down the loan. Through a loan from LTC, Monet repaid $500,000 of the bank loan, reducing the loan balance to approximately $700,000.

38. On information and belief, the bank requested that Monet pay down the loan at least in part because of the negative way the Wilkeys portrayed Monet, thus substantially impairing Monet's finances.

39. Also in or around June 2019, the Wilkeys, including Cindy Wilkey (who is Duane's wife, Aaron's mother and Monet's former bookkeeper), began ignoring critical job responsibilities, including failing to maintain accurate inventory, mis-categorizing expenses into Cost of Goods Sold, mis-categorizing expenses into incorrect categories, categorizing income items as expenses, and certifying medical equipment as completed, without actually completing critical software updates, in breach of their duty of care as key employees of Monet.

40. Then, in a scheme to devalue Monet, on or about June 28, 2019, the Wilkeys (including Cindy) unexpectedly resigned from their positions as key employees of Monet. Further, they convinced other key employees, including two plant team leaders and the Head of

Manufacturing, to quit without notice. This mass exodus gutted Monet's operations and accounting functions.

41. The Wilkeys sent a letter to Monet's employees announcing their resignation, and accusing "those leading the company" of "putting individuals first, instead of having the company's best interests in mind." See **Exhibit 8**, Resignation Letter from the Wilkeys.

42. Upon their departure, the Wilkeys took confidential, proprietary and trade secret Company information, including software, customer data and financial information. The Wilkeys deleted customer data from Monet's computer hard drive and disseminated Monet's confidential and trade secret information to a financial consultant, without first requiring that the consultant execute a non-disclosure agreement.

43. On information and belief, only after sharing critical and confidential Monet information with an outside consultant did the Wilkeys have their consultant execute a non-disclosure agreement, which they back-dated. Further, the non-disclosure agreement was not countersigned by any representative of Monet, as only Dryer was authorized to countersign such an agreement, had it existed in the first place.

**V.      To Save the Company, Dryer Conducted A Capital Call In Accordance with the Operating Agreement**

44. On or about July 30, 2019, the bank called the remainder of its loan to Monet (approximately $700,000 balance) immediately due and payable.

45. Accordingly, to avoid defaulting on the loan, Dryer notified the Members of Monet (LTC and ADW) of a $700,000 capital call and set forth the rights and obligations allocable to the new Membership Interests to be issued to those funding the capital call. See **Exhibit 9**, July 30, 2019 Notice of Capital Call.

46. In accordance with Section 9.3 of the Operating Agreement, Dryer provided the Wilkeys with Monet's year-to-date income statement and advised that ADW had 15 days to either subscribe or not subscribe to the capital call.

47. As ADW held 30% of Monet, it was required to contribute its pro rata portion of the capital call ($210,000) in order to maintain its equity position without dilution.

48. On August 26, 2019, Dryer notified the Wilkeys that he had not received a response from ADW with an intent or lack of intent to fund the Requested Amount of the capital call. See **Exhibit 10**, August 26, 2109 Notice from Dryer to ADW. Further, Dryer confirmed ADW had not contributed anything towards the capital call. *Id*. Accordingly, Dryer notified the Wilkeys that LTC chose to contribute the uncontributed share of ADW's Requested Amount, equaling $210,000, in addition to the full amount of its share of the capital call – the remaining $490,000. *Id*.

49. After the capital call, LTC holds 94.937% Membership Interest in Monet and ADW holds 5.063% Membership Interest. See **Exhibit 11**, Third Amendment to the Operating Agreement.

**VI.   The Capital Call Was Made In Accordance with the Operating Agreement and the DLLCA.**

50. An actual controversy exists between the parties with respect to their respective duties and obligations under the Operating Agreement and the DLLCA.

51. This Court has the power to make binding declarations of the rights and duties of the parties and to adjudicate the dispute that has arisen between them.

52. Dryer lawfully exercised his right as Manager of Monet to issue a capital call under Section 9.2 of the Operating Agreement.

53. Dryer did not breach any fiduciary duties when he conducted the capital call. Under the Operating Agreement, Dryer's fiduciary obligations of care and loyalty are limited to "refraining from engaging in fraud or a knowing violation of law which results or shall have resulted in material loss or injury to the Property or operations of the Company." **Exhibit 1, Section 7.8**.

54. By conducting the capital call, Dryer did not engage in fraud or a knowing violation of the law. He duly notified ADW, through the Wilkeys, of its right to contribute the Requested Amount, provided updated financials, and requested a response within 15 days. When the Wilkeys failed to indicate whether ADW had any interest in contributing the Requested Amount, LTC, as a Member who did contribute its entire Requested Amount, contributed the uncontributed portions of ADW's Requested Amount.

55. Further, the capital call did not result in a material loss or injury to Monet, its operations or its property.

56. The only loss the Wilkeys and ADW claim is a diminution in ADW's Membership Interests in Monet. Such reduction in ADW's Membership Interest did not result in any loss or injury to Monet. In fact, had LTC not contributed ADW's Requested Amount, Monet would have defaulted on its bank loan. Particularly considering the mass exodus initiated by the Wilkeys, and their theft and dissemination of Company property, issuing and funding the capital call helped guard against loss or injury to Monet.

57. Neither the Wilkeys nor ADW are entitled to any remedy under the Operating Agreement, the DLLCA or any common law cause of action, including breach of fiduciary duty.

58. Dryer and LTC are entitled to a declaration that Dryer acted consistent with the Operating Agreement and the DLLCA when Dryer issued a capital call and when LTC contributed the uncontributed portion of ADW's Requested Amount.

## VII. Monet Is Not Obligated to Reimburse the Wilkeys For Business Expenses.

59. Prior to November 2018, the Wilkeys would use Company funds to reimburse themselves for reasonable business expenses incurred on their personal credit cards.

60. In November 2018, Monet needed $200,000 in additional capital. At an in-person meeting with the Wilkeys, Dryer agreed LTC would add $140,000 to its existing loan to Monet (bringing the total principal loan amount to $640,000), and the Wilkeys would pay off the $60,000 in business expenses incurred on their personal credit cards and register the $60,000 payment as a loan from ADW to Monet.

61. Aaron Wilkey memorialized this arrangement on Monet's accounting records by recording a $60,000 loan from ADW to Monet with interest accruing at a rate of 8% per annum (The "ADW Loan"). As a member of the Accounting staff, with sole responsibility to produce financial statements and record certain journal entries related to the income statement and balance sheet, Aaron agreed that a note should be prepared documenting the ADW Loan. See **Exhibit 12**, November 5, 2018 email from A. Wilkey to J. Dryer.

62. On information and belief, Aaron never prepared a note for the ADW Loan.

63. Dryer has attempted to repay the ADW Loan in equal, monthly installments, with 8% interest per annum, through June 2022.

64. The Wilkeys have rejected Dryer's efforts to pay the ADW Loan on the same terms as LTC's loan to Monet, claiming instead that they are entitled to immediate reimbursement, and barring that, reimbursement in equal installments over three months.

65. An actual controversy exists between the parties with respect to the terms by which Monet will repay ADW or the Wilkeys $60,000.

66. This Court has the power to make binding declarations of the rights and duties of the parties and to adjudicate the dispute that has arisen between them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs LTC Partners, LLC and Joel Dryer respectfully pray that this Court enter an Order finding and declaring the following relief:

A. Joel Dryer does not owe any fiduciary duties to Monet Medical Inc., LLC, Aaron Wilkey, Duane Wilkey or ADW Partners, LLC, other than those contained in the Operating Agreement, as amended;

B. Joel Dryer acted in accordance with the Operating Agreement and the Delaware Limited Liability Company Act when he notified the Wilkeys and ADW Partners, LLC of a $700,000 capital call;

C. Joel Dryer and LTC Partners, LLC acted in accordance with the Operating Agreement and the Delaware Limited Liability Company Act when LTC Partners, LLC contributed the uncontributed portion of ADW's Requested Amount;

D. Aaron Wilkey and Duane Wilkey waived any further right to receive reimbursement for business expenses incurred on their personal credit card when they agreed to absorb $60,000 in credit card charges for business expenses and recorded on Monet's accounting records a $60,000 loan from ADW to Monet at 8% interest; and

E. For all such just and equitable relief, including accrued interest, attorney's fees and costs of suit.

DATED: September 16, 2019        Respectfully submitted,

                                                          LTC Partners, LLC and Joel Dryer

                                                          By:   *s/ Rachel L. Schaller*
                                                                   One of Their Attorneys

Rachel L. Schaller (#6306921)
rschaller@taftlaw.com
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2800
Chicago, Illinois 60601
Tel: (312) 527-4000 | Fax: (312) 527-4011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LTC Partners, LLC, a Delaware limited liability company, and JOEL DRYER, an individual,<br><br>  Plaintiffs,<br><br>  v.<br><br>DUANE WILKEY and AARON WILKEY, individuals, and ADW PARTNERS, LLC, a Utah limited liability company,<br><br>  Defendants. | No. 19-cv-6190 |

## EXHIBIT LIST

| Exhibit | Description |
|---|---|
| **1** | Operating Agreement dated on or about May 15, 2017 |
| **2** | First Amendment to Operating Agreement dated on or about December 31, 2017 |
| **3** | Second Amendment to Operating Agreement dated on or about September 26, 2018 |
| **4** | Joel Dryer's Request for Consent to Substitution of Member and/or Assignment of Membership Interest dated on or about September 13, 2018 |
| **5** | Aaron Wilkey's Request for Consent to Substitution of Member and/or Assignment of Membership Interest dated on or about October 23, 2018 |
| **6** | Duane Wilkey's Request for Consent to Substitution of Member and/or Assignment of Membership Interest dated on or about October 23, 2018 |
| **7** | January 25, 2019 Letter of Intent |
| **8** | Resignation Letter from the Wilkeys |
| **9** | July 30, 2019 Notice of Capital Call |
| **10** | August 26, 2109 Notice from Dryer to ADW |
| **11** | Third Amendment to the Operating Agreement |
| **12** | November 5, 2018 email from A. Wilkey to J. Dryer |